IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

PEGGY JONES                                                                          PLAINTIFF

v.                                      NO. 4:19-cv-00234-BRW

LARRY JEGLEY, Prosecuting Attorney For Pulaski County,
In His Official Capacity;
SYBAL JORDAN HAMPTON, In Her Official Capacity As A
Member Of The Arkansas Ethics Commission;
TONY JUNEAU, In His Official Capacity As A Member Of The
Arkansas Ethics Commission;
ASHLEY DRIVER YOUNGER, In Her Official Capacity As A
Member Of The Arkansas Ethics Commission;
ALICE L. EASTWOOD, In Her Official Capacity As A Member
Of The Arkansas Ethics Commission;
LORI KLEIN, In Her Official Capacity As A Member Of The
Arkansas Ethics Commission                                                           DEFENDANTS

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

Arkansas law imposes a complete ban on candidates for state office accepting or soliciting

campaign contributions more than two years before an election (the "Blackout Period").  Ark.

Code § 7-6-203(e).  Plaintiff Peggy Jones wishes to exercise her First Amendment right to

contribute money to candidates that she wishes to support for election in 2022, but is prevented

from doing so by the Blackout Period.  The Blackout Period is unconstitutional for two important

reasons.  First, it is not closely drawn to address an important governmental interest, because there

is no reason to believe that a campaign contribution given two years and one day before election

is more likely to be corruptive than a contribution given one year and 364 days before an election.

Second, the Blackout Period is overbroad, because it bars *all* campaign contributions, including

small contributions that do not present a potential for corruption.  Because the Blackout Period

clearly cannot stand in light of recent Supreme Court precedent holding that concerns about "quid

1

pro quo corruption" are the only legitimate basis for restricting campaign contributions, Plaintiff is entitled to injunctive relief preventing enforcement of the Blackout Period.

## BACKGROUND

Plaintiff Peggy Jones is a resident of Pulaski County, Arkansas.  (Exhibit 1 at ¶ 1.) Plaintiff has previously contributed money to political candidates.  (Exhibit 1 at ¶ 2.)  Plaintiff wishes to give money to support candidates that she believes will run for state office in Arkansas during the 2022 election cycle, but is barred by the Blackout Period from making such contributions until after May 2020 (two years before the May 2022 primary election.  (Exhibit 1 at ¶¶ 3-4.)  Absent the Blackout Period, Plaintiff would make campaign contributions to 2022 candidates before May 2020.  (Exhibit 1 at ¶ 4.)

Defendant Larry Jegley is the duly-elected prosecuting attorney of Pulaski County, Arkansas.  Under Arkansas Code § 7-6-202, violations of the Blackout Period may be prosecuted as a Class A misdemeanor.  At least one of the candidates that Plaintiff wishes to support is currently a resident of Pulaski County, Arkansas.   Defendant Jegley therefore would be responsible for prosecuting violations of the Blackout Period.   Defendants Sybil Jordan Hamilton, Tony Juneau, Ashley Driver Younger, Alice L. Eastwood, and Lori Klein are members of the Arkansas Ethics Commission.  Under Arkansas Code § 7-6-218, the Ethics Commission is empowered to levy fines against candidates who accept contributions in violation of the Blackout Period.  All Defendants are sued in their official capacities only.

Arkansas Code § 7-6-203(e), which creates the Blackout Period, provides as follows:

> It shall be unlawful for any candidate for public office, any person acting in the candidate's behalf, or any exploratory committee to solicit or accept campaign contributions more than two (2) years before an election at which the candidate seeks nomination or election. This subsection shall not prohibit the solicitation or

> acceptance of a contribution for the sole purpose of raising funds to
> retire a previous campaign debt.

Violation of the provisions of the Blackout Period established by Section 7-6-203(e) can result in prosecution as a Class A misdemeanor under Section 7-6-202, or in a fine imposed by the Ethics Commission under Section 7-6-218.

Section 7-6-203(e) was adopted by Arkansas voters in 1996, as part of an initiated act that made seven amendments to Arkansas campaign finance laws. *See* Arkansas Initiated Act 1 of 1996. Six of the seven amendments were immediately challenged and held to be unconstitutional. *See Russell v. Burris*, 146 F.3d 563 (8th Cir. 1998); *Arkansas Right to Life State PAC v. Butler*, 29 F. Supp. 2d 540 (W.D. Ark. 1998). The amendments invalidated in *Butler* included a blackout period that prohibited contributions from being offered to, or accepted by, elected officials during a period extending from 30 days before to 30 days after any session of the General Assembly. *Butler* held that such a blackout period was not narrowly drawn to serve the state's interest in battling corruption because "it does not take into account the fact that corruption can occur at any time, and that only large contributions pose a threat of corruption." 29 F. Supp. 2d at 553. The Blackout Period now at issue, as codified in Section 7-6-203(e), was the only portion of the 1996 Act that was not challenged immediately upon its enactment. Nevertheless, as set forth herein, the Blackout Period created by that provision is no less unconstitutional than its six contemporary amendments that have already been invalidated.

## ARGUMENT

## I.     STANDARD OF REVIEW.

Federal Rule of Civil Procedure 65 governs the Court's issuance of a preliminary injunction. In determining whether to grant a motion for preliminary injunction, a district court generally weighs the following four considerations: (1) the threat of irreparable harm to the moving

party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc). As the Eighth Circuit explained:

> In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties' litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

*Id.* at 113.

In a First Amendment case, however, the analysis is different and focuses almost entirely on the likelihood of success on the merits. "'When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied.'" *Wilson v. City of Bel-Nor, Missouri*, __ F.3d ___, 2019 WL 2170661, at *1 (8th Cir. May 20, 2019) (quoting *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc)). Because, as explained below, Plaintiff's First Amendment rights are being violated by the Blackout Period, she is entitled to a preliminary injunction in her favor.

## II.   ANY RESTRICTION ON CAMPAIGN CONTRIBUTIONS MUST BE A CLOSELY-DRAWN MEANS OF ADDRESSING QUID PRO QUO CORRUPTION.

The United States Supreme Court has recognized that "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." *Buckley v.*

4

*Valeo*, 424 U.S. 1, 14 (1976) (per curiam); *see also Randall v. Sorrell*, 548 U.S. 230, 246 (2006). "The First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, 191-92 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). Indeed, "[t]here is no right more basic in our democracy that the right to participate in electing our political leaders." *McCutcheon*, 572 U.S. at 191.

Plaintiff's desire to make campaign contributions is unquestionably protected First Amendment activity, for "[a] contribution serves as a general expression of support for the candidate and his views." *Buckley*, 421 U.S. at 21. As the Supreme Court has repeatedly emphasized, "when an individual contributes money to a candidate … the contribution 'serves as a general expression of support for the candidate and his views' and 'serves to affiliate a person with the candidate.'" *McCutcheon*, 572 U.S. at 203 (quoting *Buckley*, 424 U.S. at 21-22). Political contributions – like those Plaintiff is currently barred from making by the Blackout Period – thus "embody a central feature of democracy – that constituents support candidates who share their beliefs and interests." *McCutcheon*, 572 U.S. at 192.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000). Restrictions on political contributions therefore can only be upheld if, at minimum, "'the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.'" [1] *McCutcheon*, 572 U.S. at

---

[1] Plaintiff does not concede that the Blackout Period is not in fact subject to strict scrutiny. *See Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011); *see also McCutcheon*, 572 U.S. at 199. Because the Blackout Period is also unconstitutional under the "closely-drawn" test, however, this Court need not reach that question.

197 (quoting *Buckley*, 424 U.S. at 25). The "closely drawn" test imposed by *Buckley* and its progeny requires a court to "assess the fit between the stated governmental objective and the means selected to achieve that objective.'" *McCutcheon*, 572 U.S. at 199. "If a law that restricts political speech does not 'avoid unnecessary abridgement' of First Amendment rights," it cannot survive this review. *Id.* (quoting *Buckley*, 424 U.S. at 25). The "closely-drawn" test from *Buckley* applies with as equal force to the temporal limitations on contributions at issue in this case as it does to dollar limitations on contributions. *See Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 391 (5th Cir. 2018) (striking down blackout period for city council election contributions).

As the Supreme Court has long made clear, most recently in *McCutcheon*, there is "*only one* legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." 572 U.S. at 207 (emphasis added) (citing *Davis v. Federal Election Comm'n*, 554 U.S. 724, 741 (2008); *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985)). As such, any regulation restricting campaign contributions must "target what we have called '*quid pro quo*' corruption or its appearance." *McCutcheon*, 572 U.S. at 192. That phrase "captures the notion of a direct exchange of an official act for money." *Id.*

Plaintiff assumes that the State will seek to defend the Blackout Period by claiming it is designed to advance governmental interests in preventing corruption. But "[w]hile the importance of those interests is beyond dispute, their invocation still must be justified with some evidentiary showing that the state or locality enacting a contribution limit faces a problem of either actual corruption or its appearance." *Zimmerman*, 881 F.3d at 386 (citing *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 390-84 (2000)). Although the level of evidence required "will vary up and down with the novelty and plausibility of the justification raised," *Nixon*, 528 U.S. at 391, "the

existence or perception of corruption must still be more than 'mere conjecture.'" *Zimmerman*, 881 F.3d at 386 (quoting *Nixon*, 528 U.S. at 391-92).  Actual evidence is required, because mere "[r]eliance on a generic favoritism or influence theory…is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 359 (2010).  Therefore, as a preliminary matter, unless the State can come forward with some evidence of corruption relevant to the Blackout Period, this restriction on speech cannot stand.

## III.  BY COMPLETELY BANNING ALL POLITICAL CONTRIBUTIONS, REGARDLESS OF SIZE, DURING THE BLACKOUT PERIOD, ARKANSAS LAW VIOLATES PLAINTIFF'S FIRST AMENDMENT RIGHTS.

The Blackout Period is the result of an initiated act passed by Arkansas voters in 1996. Even assuming, *arguendo*, that the 1996 act resulted from genuine concerns about corruption, the Blackout Period is not "closely drawn" to address any such concerns.  By banning *all* contributions given more than two years before an election, the Blackout Period does not distinguish between those large contributions believed to be capable of causing "the existence or perception of corruption" and those that do not.  Nor does the Blackout Period bear any relationship to a time period in which corruption is more likely.  Because the Blackout Period constitutes a blunt instrument in the battle against corruption, rather than the finely-tuned instrument that must be employed in order to prevent unnecessary infringement upon First Amendment rights, the Blackout Period must be invalidated and injunctive relief granted to Plaintiff.

Although the Blackout Period at issue in this case was not challenged immediately following the passage of the 1996 initiated act, a challenge was made to a separate provision of the 1996 act created another blackout period that prohibited certain elected officials from

accepting a contribution 30 days before, anytime during, or 30 days after any session of the Arkansas General Assembly.  In *Butler*, Judge Waters invalidated that blackout provision of the 1996 act.  29 F. Supp. 2d at 550-51.  Although the *Butler* opinion preceded the Supreme Court's guidance in *McCutcheon* by nearly two decades, it recognized that blackout periods like the one at issue in this case are not "narrowly drawn" to avoid restricting fundamental political liberties. *Id.* at 553.

*Butler* recognized three fundamental problems with blackout periods like those created by the 1996 act.  <u>First</u>, the court recognized that the blackout period "prohibits *all* contributions, both large and small, during the specified periods." *Id.* at 552.  The court held that such a limitation is unconstitutional, explaining that because "[i]t is well settled that only *large* contributions pose a threat of actual or perceived corruption in the political process … restrictions on contributions must be narrowly tailored to combat the actual or perceived corruption that occurs from large contributions." *Id.* (emphasis in original) (citing *Russell*, 146 F.3d at 568-72).

<u>Second</u>, the court recognized that blackout periods are not narrowly tailored because they fail to "take into account the fact that corruption can occur at any time." *Butler*, 29 F. Supp. 2d at 553.  The court explained that if "'corrupt practices can take place during the regular session, they can just as easily take place other times during the year.'" *Id.* at 552 (quoting *Shrink Missouri Gov't PAC v. Mauphin*, 922 F. Supp. 1413, 1422 (E.D. Mo. 1996) (striking down a blackout period).)  Indeed, the court seemed to recognize that blackout periods might have the possibility of *increasing corruption*, noting the possibility "that 'dangling a carrot' before a legislator is more apt to produce the desired effect than paying up front and hoping s/he carries out the contributor's wishes." *Id.*

8

Third, and perhaps most fundamental, the court found that the State had produced no "*evidence* that actual corruption has taken place" as a result of contributions being made at the time governed by the blackout period.  *Id.* at 551 (emphasis added).  Again quoting the *Mauphin* case, the court explained that "'the harm that the defendants seek to eradicate *must exist* and its 'cure' must specifically be directed toward elimination of that harm.'"  *Id.* (emphasis added) (quoting *Mauphin*, 922 F. Supp. at 1420).

The Blackout Period at issue in this case suffers from all three of the same problems recognized more than two decades ago in *Butler* as reasons why such restrictions cannot stand. Like the blackout period invalidated in *Butler*, the bare temporal restriction imposed by Section 7-6-203(e) fails to distinguish between "large contributions with the potential to corrupt and small contributions with no such corruptive potential."  29 F. Supp. 2d at 553.  It simply bans *all* contributions made more than two years before an election without consideration of their "corruptive potential."  Blackout prohibitions such as this one are necessarily overbroad.

Moreover, again like *Butler*, the two-year Blackout Period "fails to account for the fact that political corruption may occur at any time."  *Id.*  In fact, the Blackout Period at issue here is even less "closely drawn" than the blackout period invalidated in *Butler*, because it includes non-incumbents who are at least two years from being capable of giving "a political *quid pro quo* to a contributor."  *Id.* at 552.  More important, there is no reason to believe that a contribution given two years prior to an election is somehow more corrupting than one given the next day (less than two years before the election).  To the contrary, an individual wishing to give to such a candidate is far more likely to be making the contribution because he or she wishes to make "a general expression of support for the candidate and his views" than in expectation of some favor in the distant future.

9

Finally, there is no actual *evidence* of corruption prior to the enactment of the Blackout Period that resulted from campaign contributions made more than two years prior to an election. The 1996 act was a hodgepodge of seven different campaign finance reforms supposedly designed to prevent corruption in the political process.  The other six reforms have already been struck down as unconstitutional; there is no reason to believe the State could do any better in justifying the restriction here.  This Court should adopt the reasoning of Judge Waters' opinion in *Butler* and hold this Blackout Period, like the one at issue in that case, improperly restricts Plaintiff's rights under the First Amendment.

Indeed, the case for striking down this Blackout Period is even stronger now than it would have been in 1996.  *McCutcheon* has made clear that the *only* proper reason for limiting campaign contributions is in response to concerns about corruption.  572 U.S. at 192.  Moreover, it is clear that those concerns may not be mere speculation; instead, there must be actual *evidence* of such corruption.  *Shrink Missouri*, 528 U.S. at 391-95.  Furthermore, *McCutcheon* recognized that where a base contribution limit – one that is "restricting how much money a donor may contribute to a particular candidate or committee" – already regulates the contribution, any further restrictions on contributions beyond the base limit, including restrictions on the timing of contributions, must be "justified by evidence that the additional limit serves a distinct interest in preventing corruption that is not already addressed by the base limit." *Zimmerman*, 881 F.3d at 392 (citing *McCutcheon*, 572 U.S. at 192-93); *see also Buckley*, 424 U.S. at 28 (noting that a base limit "focuses precisely on the problem of large campaign contributions[,] the narrow aspect of political association where the actuality and potential for corruption have been identified"). Arkansas law imposes a maximum amount that any one person can contribute to a candidate during any election cycle, *see* Ark. Code Ann. § 7-6-205(c) – there is no evidence that additional

restrictions on *when* that amount is contributed will somehow reduce corruption.  To the extent the Blackout Period is justified by any other reason (such as an interest in reducing the length of political campaigns), *McCutcheon* makes clear that such reasons do not justify the restriction of core First Amendment activity.  Because there is no proper, closely-drawn basis in fighting corruption underlying the Blackout Period, Plaintiff is likely to succeed on the merits and is therefore entitled to injunctive relief.

<u>**CONCLUSION**</u>

The Blackout Period violates Plaintiff's First Amendment right to give financial support to candidates of her choosing at a time of her choosing.  Plaintiff has thus demonstrated a likelihood of success on the merits that entitles her to a preliminary injunction against enforcement of the Blackout Period.  This Court should therefore enjoin Defendants from enforcing the Blackout Period during the pendency of this matter.

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
jtull@qgtlaw.com
cpekron@qgtlaw.com
ckeller@qgtlaw.com
bford@qgtlaw.com


By: <u>Chad W. Pekron</u>
    John E. Tull III (84150)
    Chad W. Pekron (2008144)
    Christoph Keller (2015145)
    Brittany S. Ford (2018102)

*Attorneys for Plaintiff*