```
 1                    IN THE UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF ARKANSAS
 2                               WESTERN DIVISION

 3       PEGGY JONES,

 4                    Plaintiff,

 5          v.

 6       LARRY JEGLEY, Prosecuting
         Attorney for Pulaski County,
 7       In His Official Capacity;
         SYBAL JORDAN HAMPTON, In Her
 8       Official Capacity as a Member
         of the Arkansas Ethics              No. 4:19CV00234 JM
 9       Commission; TONY JUNEAU, In
         His Official Capacity as a
10       Member of the Arkansas Ethics       Wednesday, June 12, 2019
         Commission; ASHLEY DRIVER           Little Rock, Arkansas
11       YOUNGER, In Her Official            1:40 p.m.
         Capacity as a member of the
12       Arkansas Ethics Commission;
         ALICE L. EASTWOOD, In Her
13       Official Capacity as a Member
         of the Arkansas Ethics
14       Commission; LORI KLEIN, In
         Her Official Capacity as a
15       Member of the Arkansas Ethics
         Commission,
16
                         Defendants.
17
             TRANSCRIPT OF HEARING ON MOTION FOR PRELIMINARY INJUNCTION
18                  BEFORE THE HONORABLE JAMES M. MOODY JR.,
                          UNITED STATES DISTRICT JUDGE
19
         APPEARANCES:
20
         On Behalf of the Plaintiff:
21
             MR. CHAD W. PEKRON, Attorney at Law
22           MR. THOMAS CHRISTOPH KELLER, Attorney at Law
             MS. BRITTANY S. FORD, Attorney at Law
23              Quattlebaum, Grooms & Tull PLLC
                111 Center Street, Suite 1900
24              Little Rock, Arkansas  72201-3325

25                                             [ CONTINUED ]
```

Christa R. Jacimore, RDR, CRR, CRC
United States Court Reporter

1

2    APPEARANCES CONTINUED:

3

4    On Behalf of the Defendants:

5

        MR. DANIEL L. MCFADDEN, Assistant Attorney General
6       MS. RENAE FORD HUDSON, Assistant Attorney General
          Arkansas Attorney General's Office
7         323 Center Street, Suite 200
          Little Rock, Arkansas  72201-2610

8

9

10

11

12

13

14

15       Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
16   transcription.

17

18

19

20

21

22

23

24

25

1          (Proceeding at 1:40 p.m., as follows:)

2               THE COURT:  We're on the record in Jones v. Jegley,

3     Case No. 4:19CV234.  For the plaintiff I have Chad Pekron,

4     Brittany Ford, and Chris Keller.  Did I get that right?

5               MR. PEKRON:  Yes, your Honor.

6               THE COURT:  Where's Tull?

7               MR. PEKRON:  Tull is in Hot Springs.

8               THE COURT:  Okay.  Sorry to bring y'all back.  I

9     didn't think about that.  I guess I should have.  Egocentric

10    personality.

11         And then Daniel McFadden here for the defendants.

12              MR. MCFADDEN:  That is correct, your Honor.

13              THE COURT:  All right.  So we are here on a motion for

14    a preliminary injunction.  Plaintiffs claim that Arkansas Code

15    Annotated 7-6-203, which imposes a complete ban on candidates

16    for state office accepting or soliciting contributions more than

17    two years before an election, they claim it's unconstitutional

18    for two reasons, which are set forth in the briefs.

19         And I'm just going to say the government -- collectively, I

20    guess, rather than any one individual.

21              MR. MCFADDEN:  That's correct, your Honor.

22              THE COURT:  -- claims not so, essentially.

23         I have gone through most, if not all, of the pleadings in

24    the matter, including Document 13, 14, 19, 20, and -- well, and

25    12 to begin with, as well as quite a bit of case law.  And so

1  with the benefit of knowing what I've read, I'll turn it over to
2  y'all for y'all's presentation.
3      Mr. Pekron?
4        MR. PEKRON:  Thank you, your Honor.  I'll try to be
5  brief today because I think the parties have explained this
6  issue in great detail in the briefs, but I'm certainly available
7  to answer whatever questions the Court might have.
8      I'd like to say first, your Honor, that I think this is a
9  very straightforward case, at least in terms of the facts at
10 issue.  Plaintiff Peggy Jones submitted an affidavit stating
11 that she wants to give financial contributions to candidates
12 running for elected office in Arkansas in the 2022 elections.
13 That affidavit stands uncontradicted, that this is, in fact, her
14 intent.
15     It is also undisputed that the blackout period imposed by
16 Arkansas Code Section 7-6-203(e) prohibits such contributions.
17       THE COURT:  Well, it prohibits the acceptance of such
18 contributions; it doesn't prohibit Ms. Jones from making one, as
19 I read it.
20       MR. PEKRON:  A contribution can't be offered unless
21 someone is there to accept it.  And so the chill on speech is a
22 chill on Ms. Jones's speech because it punishes the recipients
23 of that speech.  So your Honor is correct that that is how the
24 statute is read, but the chilling effect on Ms. Jones as a
25 result of the chill that's imposed on the listeners, the threat

1    of criminal action against the listeners, the recipients of her
2    speech, is enough to give her standing to bring this case.  She
3    is entitled, especially in a circumstance like this where the
4    speech is unpopular and there are good reasons why the
5    recipients may not want to come and challenge it themselves.
6    Nobody wants to be the candidate that's out there saying, I want
7    longer campaign cycles.  I want --
8              THE COURT:  Well, who is she going to donate to?
9              MR. PEKRON:  Your Honor, she doesn't have that in the
10   affidavit.  I don't think it's required to disclose the specific
11   candidates she wants to contribute to in order to have standing
12   to sue here.  Obviously, if your Honor believes that's a
13   necessary factor to have standing, we would supplement the
14   record with that information, but I don't believe she's --
15             THE COURT:  I think she has to tell me more than she
16   just wants to make some contributions.  She has to have some
17   particular speech that she wants to make, and so --
18             MR. PEKRON:  And she has said what her speech is.  She
19   wants to make it in the form of a contribution to a candidate
20   that's running in 2022.  I think if you go back to the --
21             THE COURT:  Well, I mean, are you going to answer my
22   question or not?
23             MR. PEKRON:  Your Honor, I actually don't know the
24   answer to exactly who she wants to contribute to.  She has told
25   me that she has people in mind that she believes are going to

1    run in 2022.  They haven't announced for the reason that they

2    can't raise any money.  They can't even go get a sign to hang up

3    and say, I'm running in 2022 because they can't raise any money

4    to pay for it.  So basically what the State is doing here --

5            THE COURT:  Well, they can announce without money to

6    pay for it, Mr. Pekron.  I mean, you're not saying that this --

7    whoever this person is can't announce that they're interested in

8    running in 2022 because they don't have any money to tell

9    anybody.  I mean, they --

10           MR. PEKRON:  Well, your Honor -- I'm sorry.

11           THE COURT:  Any newspaper person on any corner is

12   probably going to be happy to listen to them say, I'm thinking

13   about running for some office in 2022, and they don't have to

14   pay the newspaper person to print that.

15           MR. PEKRON:  Your Honor, that's possible.

16           THE COURT:  So right now all I have is her affidavit

17   that I'd like to give to a political hopeful, somebody

18   considering it, perhaps, and I'm going to need something more

19   than that, something more concrete, than I might want to give to

20   somebody running in 2022, whoever that might be, whether they've

21   announced or not or even decided to run or not.

22       So I guess what I'm telling you is, it's awfully

23   speculative right now whether or not she is going to make any

24   contribution to anybody in particular right now.

25           MR. PEKRON:  Well, your Honor, if you believe that

1    that's a predicate that we need to meet, we're certainly happy

2    to submit a supplemental affidavit with names of people she

3    intends to contribute to.  I don't think as a matter of law she

4    is required to say exactly who she wants to give to, and, in

5    fact, if you go back to the Eighth Circuit's opinion in the

6    *Butler* case, which Judge Arnold wrote, the Eighth Circuit did

7    not require the plaintiffs that were challenging other

8    provisions in this same 1996 act to identify the candidates they

9    wanted to support with their contributions.  All the plaintiff

10   argued in that case, all the plaintiff alleged is, there's a

11   limit here that says I can't give over a hundred dollars to this

12   group of candidates and give over $300 to this group of

13   candidates.  I want to give contributions in excess of those

14   amounts to people running for those offices.  And the Eighth

15   Circuit held that that was sufficient, to give her Article III

16   standing.  And that's exactly where we are here.

17        As long as she says she wants to do the kind of speech

18   that's prohibited, that's all that's required for standing under

19   Article III.  And, in fact, I think it would cause a chilling

20   effect for her to have to say who she wants to contribute to

21   because then she's putting forth her private political decisions

22   in order to vindicate her First Amendment rights.

23        In Arkansas, for example, if she wants to give less than

24   $50 to a candidate, that doesn't even have to be disclosed.

25   That could be done anonymously.

1          THE COURT:  She hasn't said that she's going to make a

2     contribution under the disclosure limit.  I mean, she hasn't put

3     forth anything -- I mean, there's case law out there that says

4     you can't just say, I want to do something, without any concrete

5     backing on it, that the notion that I might want to do this or

6     that I might want to do that, but -- that's not sufficient.  I

7     guess I've all but told you what I'm going to need, and we can

8     argue about whether or not you'll provide it, and either you

9     will or you won't.  I mean, that's simple enough.

10          MR. PEKRON:  Well, your Honor, all I'll say, first of

11     all, is that I respectfully disagree with you.  I believe *Butler*

12     has made clear that you don't need to require -- you don't need

13     to provide that sort of evidence.

14          The cases the State provides where there's nothing concrete

15     is where there wasn't a concrete intention to actually do an act

16     prohibited by the statute.  For example, in the *Zanders* case,

17     the statute at issue says you couldn't make -- it prohibited

18     making a knowingly false report of police misconduct.  And the

19     plaintiffs there said, we want to make reports of police

20     misconduct.  We intend to make true reports of police

21     misconduct.  So the Eighth Circuit said -- well, backing up,

22     they said, but we're worried that somebody will believe that our

23     true report of police misconduct is a false one and we could be

24     prosecuted.

25          And the Eighth Circuit said, okay, you haven't said you

1    want to violate the statute.  In fact, you've said you don't

2    want to violate the statute, and so you don't have standing.

3        Here, Ms. Jones said precisely, I want to engage in conduct

4    that is prohibited by this statute.  That's all that the Eighth

5    Circuit has ever required for standing, and I think *Butler* is

6    directly on point with that.

7        As I've said, your Honor, if the Court believes that that

8    information is required, we ask that rather than dismiss the

9    motion, you leave open the report for a short period of time for

10   us to provide that information.  I think it would be most

11   efficient, in any event, to argue everything today while we're

12   all here, both as to the other matters of standing and on the

13   merits.

14        THE COURT:  No, I'm going to let you argue everything

15   you're here for today and then just let you supplement that, and

16   I'll keep the record open for that.

17        MR. PEKRON:  Okay.  That's what we'll do.

18        The other parts of standing beyond what we've already

19   discussed are, the plaintiffs have argued -- well, before we

20   even get to that, I want to put the blackout period in context.

21   The blackout period that was imposed by 7-6-203(e) prohibits

22   contributions made more than two years before an election.  That

23   blackout period is one of seven campaign finance reforms created

24   by Initiated Act 1 in 1996.  The other six reforms were all

25   immediately challenged and held to be unconstitutional.  Three

1  were held unconstitutional in an Eighth Circuit opinion that

2  Judge Arnold authored in *Russell v. Burris*.  The other three

3  were held unconstitutional by Judge Waters in *Arkansas Right to*

4  *Life State PAC v. Butler*.  One of the three invalidated by Judge

5  Waters was a blackout period in contributions made during a

6  session of the General Assembly.

7         THE COURT:  Is that the 30 days before, 30 after, and

8  then all during?

9         MR. PEKRON:  Yes, your Honor.  30 days before, after,

10  and during.

11     Judge Waters said absent any evidence that demonstrated a

12  greater risk of corruption during that particular period of

13  time, the restriction on speech caused by the blackout period

14  was unconstitutional.  Here, there's similarly no evidence of

15  corruption made by contributions more than two years before an

16  election that's greater than corruption at any other time

17  period.

18         THE COURT:  Mr. Pekron, can you slow down a little

19  bit?

20         MR. PEKRON:  I'm sorry.

21         THE COURT:  No worries.

22         MR. PEKRON:  Because there's no similar evidence of

23  corruption here, the blackout period similarly should be

24  invalidated.

25     Your Honor, we're here today and plaintiffs request that

1    this Court preliminarily enjoin the blackout period during the

2    pendency of this case.  The parties do not disagree that in a

3    First Amendment case, the only relevant consideration for

4    injunctive relief is whether the plaintiff has demonstrated a

5    likelihood of success on the merits.  And that makes sense

6    because the Eighth Circuit and other courts have generally

7    assumed that when the First Amendment rights are being abridged,

8    the other factors that are normally applicable to injunctive

9    relief at the preliminary stage, such as irreparable harm and

10   the public interest, are expected to be met as a matter of law.

11   And, as we'll get to shortly, plaintiff has demonstrated a very

12   strong likelihood of success on the merits.  And, in fact,

13   that's seen by the fact that the State's response brief devotes

14   most of itself to standing and other issues as to why this Court

15   should never reach the merits.

16       I think we've already pretty well discussed the first point

17   I was going to make on standing, but I want to go beyond the

18   issue of whether she has to provide specific names, because the

19   State has also alleged that even if she provides a specific

20   name, that may not be enough, because according to the State,

21   she should first violate the statute and then see if anybody is

22   prosecuted because of it.

23       But the Eighth Circuit precedent, including Judge Arnold's

24   decision in *Butler*, made clear that all that's required to

25   create Article III standing is a specific intent to pursue

1    conduct in violation of the challenged statute.  That's exactly
2    what plaintiff has done here.  She said she wants to make
3    contributions more than two years before the election.  The
4    blackout period prohibits that type of contribution.  And that's
5    all that's required for standing.

6         Your Honor, the State's response to this is to allege that
7    plaintiff hasn't made a credible fear of prosecution for anyone
8    until and unless the statute is violated.  But with all due
9    respect, that's exactly the opposite of what the Eighth
10   Circuit's law of standing in the First Amendment context
11   requires.  Cases like *Butler* and *281 Care* make clear that you
12   don't have to wait until a prosecution arises in order to
13   challenge a statute in federal court.

14        Nobody's required to make the choice that the State
15   suggests here, that someone should violate the First -- should
16   violate the statute and then see if prosecutorial discretion
17   will keep anyone from being prosecuted under it.

18        Again, I'd just mention that to the extent the State relies
19   upon cases showing that there's not a credible fear of
20   prosecution, those are cases where the conduct at issue may or
21   may not violate the statute, depending on how somebody else
22   looks at it later.  In fact, those cases, like the *Zanders* case,
23   plaintiff says we don't want to violate the statute, we don't
24   want to make a false police report, but we're afraid the State
25   is going to interpret our report as a false report, and

1    therefore we're chilled.  That's not this case.  There's no

2    question that contributions made more than two years before an

3    election violate Arkansas law.

4         The State has also contended that the plaintiff doesn't

5    have Article III standing because she is currently refraining

6    from violating the blackout period.  But, your Honor, the Eighth

7    Circuit has been clear that self-censorship is by and of itself

8    enough injury in fact to create Article III standing.  Again,

9    that's what *Butler* held.

10        Turning briefly to the other two arguments the State makes

11   as to why this Court shouldn't hear the merits, first is the

12   alleged sovereign immunity with respect to the Ethics Commission

13   defendants.  But the State admits that they are proper

14   defendants in this case if they have something to do with the

15   enforcement of the act in question.  And here it's undisputed

16   that the Ethics Commission can impose fines against candidates

17   that are recipients of the plaintiff's contributions.  Although

18   the commission can't act against the plaintiff directly, they

19   can still chill her speech by punishing the recipients.

20        Plaintiff is therefore entitled to ask that the commission

21   be barred from creating that chill upon the recipients of her

22   speech.  She doesn't seek money damages against them.  *Ex Parte*

23   *Young* prevents an injunction to prevent them from engaging in

24   unconstitutional activities.  Sovereign immunity doesn't apply.

25   Nor should this Court abstain in favor of a state court

1   determination.

2       The State alleges, the State argues that this Court should

3   abstain in favor of some determination of the blackout period in

4   the future, presumably following a prosecution in state court.

5   But we're not aware of any case in which a state court has

6   abstained in a matter involving federal constitutional rights in

7   deference to a state determination of those rights.

8       The defendant cites the general rule that a federal court

9   should not hold --

10          THE COURT:  Mr. Pekron, I'm going to make sure I heard

11  you correctly.

12      (Reviewing realtime screen.)

13      The way I heard you and it was transcribed is that you're

14  not aware of any case in which a state court has abstained in a

15  matter involving federal constitutional rights.

16          MR. PEKRON:  I misspoke.  It should be a federal court

17  has not abstained in a case involving federal rights.

18          THE COURT:  I thought that's what you meant, but I

19  wanted to make sure that that was what you were saying.

20          MR. PEKRON:  Thank you, your Honor.  I appreciate you

21  allowing me to clarify the record on that point.

22      The State here relies upon the general rule that a statute

23  should not be declared unconstitutional if it's subject to a

24  narrowing constriction, construction that would save its

25  constitutionality.  But that's not even the doctrine of

1   abstention.  That's just the doctrine of constitutional

2   avoidance.  In any event, the State hasn't suggested what that

3   narrowing construction might be.

4        The statute is clear.  It says no contributions more than

5   two years before an election.  We can't envision what a

6   narrowing construction of that would be.

7        In any event, if the State was correct, Judge Arnold should

8   have abstained in the *Russell* case and Judge Waters should have

9   abstained in *Butler*.  Those were the two cases that invalidated

10  the other six provisions of the 1996 act.  We would respectfully

11  suggest that those judges did not err, and this Court should

12  proceed with vindicating plaintiff's constitutional rights.

13       Now we're going to turn to the merits.  Plaintiff has

14  demonstrated a strong likelihood of success here.  The State's

15  argument on the merits is simple.  They just say we don't like

16  corruption, and because of that we can impose whatever

17  restriction on speech we think is necessary to reduce

18  corruption.  With all respect, that's just not how it works.

19  Because the State hasn't presented any evidence that would

20  satisfy the high evidentiary bar that is required in order to

21  burden plaintiff's speech here, plaintiff has shown a likelihood

22  of success on the merits.

23       First of all, your Honor, there's no question that the

24  campaign contributions that plaintiff wants to make are

25  protected speech.  Even *Buckley v. Valeo* recognized that a

1    desire to make campaign contributions is a protected First

2    Amendment activity.  The Court said in that case a contribution

3    serves as a general expression of support for the candidate and

4    his views.

5        Because the government wants to restrict that speech, cases

6    like *United States v. Playboy* have made clear that the State has

7    the burden of proving the constitutionality of the restriction.

8        Your Honor, the Supreme Court in *McCutcheon* made clear what

9    that means.  Restriction on political speech can only be upheld

10   if the State demonstrates a sufficiently important interest and

11   employs means closely drawn to avoid unnecessary abridgement of

12   associational freedoms.

13       In other words, a law must fit the objective without

14   unnecessarily restricting speech.

15       The Supreme Court has repeatedly emphasized, most recently

16   in *McCutcheon,* the only interest that's legitimate for

17   restricting campaign contributions is to combat, quote, quid pro

18   quo corruption or its appearance; in other words, the direct

19   exchange of an official act for money.  Very narrow interest.

20       It's not enough just to say that there's an interest in

21   preventing corruption.  The State has to come forward with some

22   evidence to support the particular restriction at issue.

23   *Citizens United* dealt with this general corruption idea and said

24   you can't just say corruption, because if that's enough, that

25   would justify anything that would possibly restrict speech.

1    That's exactly what the State would have this Court do here.

2    They've said, well, we're worried about corruption; therefore,

3    the blackout period is valid.  The Supreme Court requires more.

4    The First Amendment requires more.

5         The State has come forward with no evidence at all to link

6    contributions made more than two years before an election with

7    an appearance of corruption beyond that which comes from

8    contributions made less than two years before an election.  The

9    only thing the State even mentions in its brief -- and it's not

10   evidence.  It's just something it mentions.  It's we all know

11   there's corruption at the General Assembly.  But the State

12   doesn't even try to argue, much less provide evidence that that

13   corruption has anything to do with the timing of the

14   contributions.  In fact, what we've all seen, the problem with

15   corruption comes because people are taking money way over and

16   beyond $2,700, which is the limit for contribution limits in

17   Arkansas.

18        That runs right into the problem that *McCutcheon* recognizes

19   and that the Fifth Circuit recognized in *Zimmerman* when it

20   similarly struck down blackout periods, which is that because

21   Arkansas already has a maximum on contributions -- you can give

22   $2,700 in the primary, $2,700 in the general, that's it.

23   Because there's maximum limits on contributions, any additional

24   restrictions on campaign contributions have to be supported by

25   evidence which would show that this restriction serves a

1    distinct interest not addressed by the base limit.

2         In other words, the State has to show how the blackout

3    period itself fights contribution -- or fights corruption, I'm

4    sorry, in a way that's not already addressed by the $2,700

5    contribution limit.

6         In other words, the State has to answer this question:  How

7    is a $2,700 contribution or even a $27 contribution made more

8    than two years before the election more corruptive than a $2,700

9    or even a $27 contribution made less than two years before the

10   election?  The State doesn't even try to answer that question.

11        So, as a result, the plaintiff suggests that this Court

12   should follow the same analysis used by the Fifth Circuit in the

13   recent case in *Zimmerman* and by Judge Waters in the *Butler* case.

14   Both cases recognize that absent any evidence that the timing of

15   a contribution affects the appearance of corruption, the

16   government could not demonstrate that the maximum limit on

17   contributions was not sufficient to prevent corruption.

18        Both courts acknowledge the obvious, which is that

19   corruption can take place at any time, and so there has to be

20   some evidence that the particular times subject to the blackout

21   period are particularly prone to corruption.  The State doesn't

22   provide that evidence here.

23        Moreover, as Judge Waters noted, blackout periods are

24   necessarily overbroad because they bar all contributions

25   regardless of size.  He cites Judge Arnold's opinion in *Russell*

1   for the proposition -- it's not just a proposition.  It's

2   well-recognized that only large contributions pose a threat of

3   corruption.  And as Judge Waters recognized, because the

4   blackout period prohibits all contributions, large, small, or

5   otherwise, it's necessarily overbroad and not closely drawn to a

6   governmental interest.  This blackout period suffers from all

7   those same infirmities and therefore should likely be held

8   unconstitutional.

9         Your Honor, in closing, we recognize that the blackout

10  period was probably enacted because people don't like long

11  campaigns, probably think two years is long enough.  But

12  disliking particular types of speech is no reason to bar it,

13  particularly when the speech at issue is core political speech

14  like these contributions.  In fact, it's unpopular speech that's

15  the most important reason why we have the First Amendment.

16        Here, the State has not shown any evidence supporting the

17  only valid reason that the Supreme Court has given to limit

18  plaintiff's speech, which is an interest in fighting quid pro

19  quo corruption.  Because plaintiff is likely to prevail on the

20  merits, we would ask this Court to give her a preliminary

21  injunction barring enforcement of the blackout period during the

22  pendency of this case.

23        THE COURT:  Thank you, Mr. Pekron.

24        MR. PEKRON:  Thank you, your Honor.

25        MR. MCFADDEN:  Your Honor, may I approach?

1          THE COURT:  You may, Mr. McFadden.

2          MR. MCFADDEN:  Your Honor, in addition to the

3    preceding arguments that the State has made through their

4    response to plaintiff's request for the preliminary injunction,

5    I have to say I took a chance to take a look at the statute

6    again this morning, and maybe just fresh eyes give you a

7    different perspective.  But judging that in conjunction with

8    what the plaintiff has stated in her affidavit for this motion,

9    or for this hearing, rather, I think there's a good case to make

10   that, frankly, she can do as she claims she can do right now.

11   And what I mean by that is that 7-6-203(e) has been challenged,

12   which states in the first sentence at the very end:  At which

13   the candidate seeks nomination or election.

14       That's assuming the candidate has sought the election or

15   announced themselves.

16       Here, in her affidavit, there is no mention or reference

17   whatsoever as to anyone actually announcing.  Rather, she states

18   that she wants to encourage people to run for office.  So taking

19   that into consideration, in addition to our previous arguments,

20   I don't know what is stopping her right now other than herself.

21       Additionally and equally important, just going on an

22   assumption that there may be a candidate out there for whatever

23   form of office who may be an incumbent shall also have the

24   opportunity to donate to a previous campaign debt.

25          THE COURT:  Well, I want to set standing aside for a

1    moment because we're going to wade through that in a moment, but

2    let's assume that it's two and a half years before an election,

3    that somebody has stood on a mountaintop and screamed:  I want

4    to run for Governor.  Didn't necessarily have any money to do

5    that, but said it.  Somebody heard him and printed it.  And so

6    now it's out there that he has maybe not filed, but has shown an

7    interest in running.  And let's assume for a minute Ms. Jones

8    likes his message and wants to contribute to him.  What is it

9    about a two-year period that makes him less likely to feel

10   bribed because of that contribution?

11        And I guess a better question was, what would keep him from

12   feeling just as obligated to Ms. Jones had he taken it within

13   the two-year period?  Maggio took a contribution well within the

14   two years.  It was within 180 days from the election.  And that

15   didn't prevent him from getting into his mess.  How is

16   Ms. Jones's contribution, assuming that we have standing just

17   for the sake of argument, going to somehow corrupt or not

18   corrupt, depending on the timing of the contribution, this

19   imaginary candidate?

20            MR. MCFADDEN:  Well, your Honor --

21            THE COURT:  And that's the question that they've asked

22   you to answer, and I know you say, I don't want to answer that

23   because I don't think she has standing.  And I'm not saying

24   you're saying that, but humor me for a moment and let's assume

25   that there's standing, because I clearly think that Mr. Pekron

1    is right that you don't have to violate the statute to have

2    standing.  I do believe you have to show something more than a

3    passing interest in being involved in the process, and so I am

4    going to request that he provide me something that gets her past

5    the front door of the standing, but I'm not going to make her go

6    out there and try to contribute to somebody that might either

7    get them prosecuted or her herself.  I'm not sure that she can

8    be prosecuted under this statute.  But I do feel that the fact

9    that somebody can as a result of that action is sufficient to

10   make the leap from this is all about candidates, not about

11   donors.  But I've searched my mind for some reason why or some

12   evidence in the record of an indication that two years is really

13   a meaningful period of time for which you can delineate likely

14   quid --

15           Say that for me, Mr. Pekron.  I need a glass of water.

16           MR. PEKRON:  I had to practice that for the last four

17   days to not screw it up, so I'll probably screw it up.  Quid pro

18   quo.

19           THE COURT:  Quid pro quo.  And after some water, I can

20   say it, actually.

21           MR. MCFADDEN:  You can say tit for tat, too, if that

22   works, your Honor.

23           THE COURT:  I'm sorry?

24           MR. MCFADDEN:  You can say tit for tat, too.

25           THE COURT:  Indeed.  But do you have anything -- is

1  there any legislative intent?  Is there any hearings before the

2  legislature that put anything -- I haven't seen a lick of

3  evidence other than the notion that people want to hear from us

4  more than two years before an election, and they're right.  But

5  I'm not sure that's sufficient.

6       And so that's my threshold issue is, we've seen a lot of

7  corruption lately.  Not any of it has been a result of campaign

8  contributions that have been made in excess of two years.  And

9  I'm not sure that that's a self-fulfilling evidentiary burden

10 that people have been getting thrown in jail a lot lately who

11 have been hanging around the legislature, and make the

12 connection that they've somehow done that because of early

13 contributions.

14      And I think you've got a tough position to champion today

15 because I'm not sure you've been given any rocks to throw.  And

16 I'm not criticizing you for that because I'm sure you looked in

17 the box and there wasn't much to throw, but --

18           MR. MCFADDEN:  We're working with what we've got, your

19 Honor.

20           THE COURT:  Right.  I understand that, and I'm not

21 being critical of you or the government's position at all, other

22 than the fact that your likelihood of success on the merits or

23 the plaintiff's has in large part to do with you convincing me

24 that you've got something that we'll talk about sometime down

25 the road.  Because I'm not aware of it and it hasn't been put in

1    any briefings that if you just give us a minute, we'll come up

2    with some stuff.  Because we have all this; it just hasn't been

3    prepared because we got caught flatfooted.

4         Are you aware of any type evidence, scientific or

5    otherwise, that's going to be available to you in a final

6    hearing on the merits?

7              MR. MCFADDEN:  Well, your Honor --

8              THE COURT:  And I don't care that you even produce it.

9    It's just right now I'm just curious if there is any, because I

10   don't think there is, but I don't know that.

11             MR. MCFADDEN:  Your Honor, frankly, as of this moment,

12   I'm not currently aware of any other evidence.  That's not to

13   say that it's not out there, but after doing research on the

14   issues, talking to various interested parties and those who may

15   have knowledge, as of this stage in the litigation as opposed to

16   later on farther down the line, I'm currently unaware of any

17   such evidence.

18        But if it please the Court, too, to address, like, some of

19   the issues or even the example --

20             THE COURT:  And I'm not deciding on the merits today.

21   I'm just trying to decide who is likely to win down the road.

22             MR. MCFADDEN:  Certainly, your Honor.

23             THE COURT:  I want to make sure that I'm not making

24   you put up or shut up today.  I'm just trying to get a notion of

25   whether or not what I believe is actually correct about what you

1    have so far.

2         MR. MCFADDEN:  So at this point what you've seen is

3    currently what the State has to offer at this stage.  But to

4    address, I guess, your hypothetical that even assuming for

5    argument purposes that the plaintiff has established standing

6    now, or even later, upon potentially supplementing this case

7    with some evidence, to even claim the chilling effect, though,

8    there must still be a, quote, unquote, specific present

9    objective harm or threat of specific future harm.

10        It has to be a credible threat, your Honor, and there's

11   been no attempt at prosecution here.  There's been no government

12   action other than enacting the statute itself.

13        THE COURT:  Has the Ethics Commission ever taken

14   action against a candidate?

15        MR. MCFADDEN:  Your Honor, I think it's fair to assume

16   that, yes, the Ethics Commission has taken action against a

17   candidate.

18        THE COURT:  Okay.

19        MR. MCFADDEN:  Particular to this statute, I'm

20   currently not aware, especially the challenged portion of the

21   statute.  But even going down that route with the Ethics

22   Commission, compared to any action or inaction against the

23   plaintiff, the State would still submit that that's still a

24   steep slope to climb because the Ethics Commission has no power

25   over the plaintiff whatsoever.  They're a creature of statute.

1    They're limited --

2              THE COURT:  You do -- I guess let me rephrase because

3    we've been kind of -- I don't want to call it a steep slope

4    deal, but the statute is what's being attacked, and I understand

5    that you say you have no power over the plaintiff, but you do

6    have power to enact the statute; correct?

7              MR. MCFADDEN:  Yes, sir.  The Arkansas General

8    Assembly has that authority.

9              THE COURT:  Right.  And I guess the argument was, we

10   don't have anything to do with that, but you do have or --

11   meaning you, I want to say the Ethics Commission does have

12   authority to require compliance or issue punishment for

13   violation of 7-6-203(e).  Correct?

14             MR. MCFADDEN:  Yes, sir.  The Ethics Commission has

15   that authority over candidates, but not the plaintiff herself.

16             THE COURT:  Right.  And I guess what I'm saying is is

17   that the notion was is that we don't have -- we're only

18   empowered to levy fines against candidates, but what you're

19   empowered to do is levy fines against violators of 7-6-203(e).

20   So you can't make any argument that you don't have anything to

21   do with the statute; it's the statute that's been attacked.  And

22   this has to do with your sovereign immunity argument, that we

23   can all agree as a matter of fact that the Ethics Commission is

24   in charge of enforcing this statute, and your distinction is is

25   this particular plaintiff isn't the proper person to bring it

1    because we can't enforce anything against her.  And that would

2    go back to standing, but not sovereign immunity, because I want

3    to make it clear that there isn't any question the Ethics

4    Commission is enforcing or is the one in charge of enforcing

5    this particular statute.  Is that fair enough?

6           MR. MCFADDEN:  That's fair, your Honor, and just to

7    clarify, too, that sovereign immunity argument based on *Ex Parte*

8    *Young* was only applied or argued as for the Ethics Commission

9    against the plaintiff, as opposed to the Pulaski County

10   prosecutor or any other prosecutor out there.

11          THE COURT:  I understood that, and I didn't mean to

12   say in that regard the State, or the big defendant, versus

13   separate defendants.

14          MR. MCFADDEN:  And, your Honor, even just to elaborate

15   a little bit more, if anything else, for the record, for

16   purposes of the record, that even for the Ethics Commission to

17   so much as attempt to enforce a statute, so many hurdles have to

18   be cleared for them to even get to the point of enforcement.

19   You know, they are complaint driven.  Someone has to make a

20   complaint within four years of the alleged violation.  And this

21   is under Arkansas Code Annotated 7-6-218.  It has to be -- the

22   allegation or the complaint has to be made within four years of

23   the violation.  At that point they have a duty to investigate

24   because there's been an allegation of wrongdoing made against

25   them.

1    THE COURT:  Slow down a little bit, Mr. McFadden.  But
2    go ahead.
3    MR. MCFADDEN:  Oh.
4    THE COURT:  I was going to say, for the benefit of my
5    court reporter, slow down a little bit.
6    MR. MCFADDEN:  I got a little excited there.
7    THE COURT:  This election law will do it to you.  So
8    go ahead.
9    MR. MCFADDEN:  Every now and then.
10    If that complaint has been made within that relevant time
11    period, then they have a duty to investigate.  There may or may
12    not be a hearing, but anyone accused of violating that is
13    entitled to a hearing.  Then at that hearing, it's incumbent
14    upon the State, or the Ethics Commission, rather, to be more
15    particular about it, to determine or to prove that, yes, indeed,
16    this candidate has violated this portion of the statute.
17    So even if it is found to be true that they did, you know,
18    violate the statute, they're still provided with a number of
19    options.  But first and foremost, they can just say, no, we're
20    not going to force this because we've found good cause to be
21    shown that it's not going to happen.  And that's in Section 4 of
22    the statute.  Alternatively, they can issue a letter of
23    reprimand, which ultimately could just be a slap on the wrist to
24    the candidate.  They can tell the candidate, no, you need to
25    update -- you need to update various disclosure forms or, you

1    know, maybe we'll fine you, which would be limited to no less

2    than $50 or no more than $2,000.  But then, alternatively, they

3    could report the finding to law enforcement, but then that's

4    going down the other barrel of worms to determine whether or not

5    any prosecutor even wants to exercise that prosecutorial

6    discretion in enforcing that statute.

7         So on behalf of the Ethics Commission, they would say that

8    even getting to that point, so many hurdles have to be crossed,

9    and then we're -- there's no allegation that they've gotten even

10   anywhere close to that.  And so at least based on *Ex Parte*

11   *Young* --

12         THE COURT:  Well, that would go back to the argument

13   that you're going to have to violate the law to put it in play,

14   and I've already ruled that the current case law doesn't require

15   you to break the law to challenge the constitutionality of one.

16   And so under your scenario, they would have to have broken the

17   law, gone through all the appeals, tried to justify things, in

18   order to get to the Ethics Commission, who I think we

19   acknowledge is empowered to punish violations of the statute.

20   And that may be another way of arguing that no one's gone to

21   arrest anybody yet, but I don't think the current law requires

22   that, and so --

23         MR. MCFADDEN:  Anyway, your Honor, well, moving on,

24   other than standing, which is -- goes without saying based on

25   the pleadings, the argument here, that's the primary argument on

1  behalf of the State, and aside from sovereign immunity, then the

2  State would submit or request the Court to abstain from holding

3  this and allow the process to work through and meander their way

4  through the state court system.

5         THE COURT:  So what's pending before a state court

6  that I would hold off and wait on?

7         MR. MCFADDEN:  To my knowledge, there's nothing

8  pending in the state court system, at least in Pulaski County in

9  Arkansas, because that's where they would file it, where the

10 alleged cause of action has arisen.

11        THE COURT:  Is there any lawsuit in state court

12 dealing with this statute currently pending before any Circuit

13 Court in Arkansas?

14        MR. MCFADDEN:  Not to my knowledge, your Honor.  If

15 there were any pending --

16        THE COURT:  Would y'all have been notified had it

17 been?

18        MR. MCFADDEN:  Hopefully.  Sometimes we don't --

19        THE COURT:  Fair enough.  That's fair enough.  That,

20 too, is required by statute, but you're -- your point is well

21 taken.  We've had to circle back several times to pick up the

22 State back in the day, but, anyway --

23        MR. MCFADDEN:  Sometimes they let us know when it's

24 too late and we have to come to the Court and ask for

25 forgiveness.

1    THE COURT:  Okay.  None that you've been made aware

2    of.  We'll put it that way.  Okay?

3    MR. MCFADDEN:  That is correct, your Honor.  But it's

4    worth pointing out, too, that federal courts have also

5    acknowledged that Arkansas state courts are perfectly capable of

6    handling a federal lawsuit and -- I'll rephrase that.  They're

7    perfectly able to handle allegations of violations of federal

8    law or constitutional violations.

9    And inasmuch as, you know, getting past the State's

10   argument that the Court is inclined beyond standing, beyond

11   sovereign immunity, beyond our argument for abstention, but

12   getting to the brass tacks of the First Amendment issues, then

13   the State would still submit pursuant to *Buckley v. Valeo*,

14   there's -- I think all parties can agree that corruption is a

15   legitimate governmental interest and that the prevention of that

16   or the appearance of that is enough to satisfy at least the

17   first portion of that, but then --

18   THE COURT:  I agree with that, that corruption is a

19   legitimate state interest.

20   MR. MCFADDEN:  And inasmuch as getting to the second

21   part of that, for lack of a better term, whether it's fine-tuned

22   or narrowly tailored to address that, what we're talking about

23   is temporal or time restrictions.  The State would still submit,

24   too, that in reference to the *O'Toole* case out of the Sixth

25   Circuit, although it did address judicial races, that

1    legislators and judicial officers, too, are all held to a very

2    high standard in that there is a general principle that -- at

3    least acknowledged by the Sixth Circuit, that the farther out a

4    campaign contribution is made, the greater the likelihood of

5    potential, real or not, bias or, for lack of a better term,

6    corruption.  Which is not to say that that would be the case

7    there, but in reliance upon the *O'Toole* ruling, the State still

8    submits that argument.

9            THE COURT:  How do you get past Waters's argument or

10   opinion about this is all contributions, great and small, that

11   opinion that it's just too broad because -- and I'm saying this

12   in jest because I've heard it in politics:  You can rent me for

13   that, but you can't buy me for that.  The notion that something

14   isn't big enough to really get my attention in a five or 25 or,

15   to use Mr. Pekron's number, $27 contribution.  Why do you

16   prohibit those for two years?

17       And I guess the problem I'm seeing with your side of the

18   argument is that these cases out there essentially say that you

19   can't limit the small contributions with the big, and this

20   statute has, even if it's to address corruption.  It doesn't

21   appear to be narrowly tailored, either in time or in amount, to

22   take care of the bad actors.  And I guess until somebody is

23   willing to get bought off for $27, I guess they could be your

24   poster child that you could put up, but -- and I hope inflation

25   has gotten us past that.  But how do you address that, that

1  hurdle that's in your way?  And you may not be able to.  That's

2  fair enough, too.

3  　　　　MR. MCFADDEN:  For lack of better terms, your Honor,

4  it is what it is at this point.  The statute, the State would

5  submit it speaks for itself that it's the intent of the

6  legislature, consistent with the will of the Arkansas

7  electorate, that they believe two years is sufficient to attempt

8  to prevent corruption.

9  　　　But to, you know, address more particularly what makes the

10  difference between a campaign contribution from two years and

11  one day out compared to, say, one year and 364 days out -- just

12  by analogy, you hit me, what's the difference in the statute of

13  limitations?  You know, just because something may have

14  happened, does it change, you know, from did an assault happen

15  or not, or is it right for a court to consider that if, you

16  know, they file the claim a year and a day late?  Or, excuse me,

17  one day late compared to ensuring that they file it within one

18  day before the expiration of the statute of limitations?

19  　　　I understand the implications of judicial economy and

20  whatnot, but, you know, many of the statutes of limitations are

21  also creatures of statute.  And it's not always necessary for --

22  or the State submits, too, that it's not there -- it's not there

23  for the Court to, you know, question the wisdom or rightness of

24  the law.

25  　　　　THE COURT:  And I'm with you there.  I'm right there

1    with you on the wisdom and the rightness.  I'm not big on

2    throwing my dad under the bus and having him eligible for

3    contributions either.  I'm kidding about that because he's been

4    prohibited from making contributions for most of his adult life.

5    And I don't mean to make light of that, but I think you've

6    probably answered my question best you're going to be able to.

7            MR. MCFADDEN:  At least at this stage, your Honor.

8    And I guess pending any further questions, we'll defer to

9    Mr. Pekron.

10           THE COURT:  Mr. Pekron, any last brief words?

11           MR. PEKRON:  Very brief, your Honor.  Your Honor, I'll

12   just make a couple of very quick points.

13       First is, regarding the role of the Ethics Commission,

14   they're equally as responsible for creating the chill as the

15   prosecutor.  And, in fact, if you go back to the *Butler* case, in

16   the Eighth Circuit, all the defendants -- the defendants in that

17   case were the Benton County prosecutor and all the members of

18   the Arkansas Ethics Commission, because they're the ones, all of

19   them can punish recipients of plaintiff's speech.

20       Very briefly regarding *O'Toole*, your Honor, *O'Toole* is a

21   case about judicial elections.  As the Court is well aware,

22   judicial elections have a different set of rules.  It's not

23   about corruption; it's about the integrity of the judiciary and

24   the idea we don't like judges running around collecting money

25   all the time because that makes judges look corrupt.  That's a

1   different set of factors.  The evidentiary burden is not the

2   same.  And, in fact, *O'Toole* itself recognizes that because

3   we're talking about judicial elections, we know the integrity of

4   the judiciary is an accepted reason, and so we don't have to put

5   on evidence of that.  *McCutcheon* has made clear that in campaign

6   contributions in political elections, nonjudicial elections,

7   that evidence is required.

8        Your Honor, the last thing I'd just like to do is

9   clarify -- I just want to make sure that I know what the Court

10  is expecting to see.  I'm prepared to present an affidavit from

11  plaintiff saying, here are the candidates that I want to give

12  contributions to in the 2022 election.  Is that what the Court

13  is expecting, or does the Court want something beyond that?  Not

14  to put you on the spot, but if there's something your Honor --

15           THE COURT:  I think that would be sufficient.  What I

16  need is to satisfy myself that there's something more than a

17  notion of general contributions but that they -- that that

18  speech has some content to it.

19           MR. PEKRON:  I understand.

20           THE COURT:  As opposed to, I'm in favor of candidates.

21           MR. PEKRON:  Yeah.

22           THE COURT:  Something that would take it beyond the

23  realm of, I've just got a notion that I might want to get

24  involved in politics, because to me that's -- as I just

25  mentioned, that's speech without content, that -- anyway --

1           MR. PEKRON:  I understand.

2           THE COURT:  I think it would satisfy what I'm looking

3   for that I have specific people that I have in mind as opposed

4   to I just don't like this law.

5           MR. PEKRON:  I understand.

6           THE COURT:  I can't -- I don't want to pin you down

7   because it's not fair for me to tell you what the evidence needs

8   to be, but in this particular instance, I think you're asking me

9   what would satisfy me, and I believe that would.

10          MR. PEKRON:  Okay.  Thank you.  As far as timing, I

11  think I can get you that within a few days, but I would just ask

12  until the end of next week, if necessary.  But I'll try to get

13  it to you a lot sooner than that.

14          THE COURT:  That's fine.  The sooner you get it, the

15  sooner you'll get an answer from me.

16          MR. PEKRON:  I understand.

17          THE COURT:  And so --

18          MR. PEKRON:  Our interests are aligned.

19          THE COURT:  Yes.  We'll just leave it at that.

20          MR. PEKRON:  I understand.  Thank you, your Honor.  I

21  have nothing further, unless the Court has any other questions.

22          THE COURT:  I don't at this time.

23          MR. PEKRON:  Thank you.

24          THE COURT:  I am going to state for the record that I

25  do not believe that the government's position regarding standing

1    dealing with whether or not Ms. Jones should have to actually

2    violate the law before she has standing to contest it is

3    supported by the case law, and so I'm ruling against the State

4    on that portion of the standing.

5        We've already discussed the earlier portion of the standing

6    that I'm taking under advisement.

7        I do not believe that the sovereign immunity argument is

8    sufficient to either dismiss the case or deny relief in this

9    case because I believe that they are empowered to levy fines

10   against violations of the statute, and it would be difficult to

11   conceive how it wasn't chilling for Ms. Jones to not be able to

12   make a contribution to an individual who wouldn't be found in

13   violation of the statute by receiving it.

14       I also don't see any legitimate reason under the law to

15   abstain or defer, as I have in my notes.

16       I do think that the prevention of corruption is a

17   legitimate state interest.

18       And I will deal with the remainder of what I've left

19   unresolved in a written order pending further submissions.  And

20   if you don't mind sending what you're going to send to

21   Mr. McFadden and he can decide whether or not to respond, and I

22   don't need full-blown briefs.  I just need what y'all want me to

23   hear, if you want to do it.  It's up to you, but you can

24   certainly give me a page or two, but I'm not looking for any

25   re-briefing of the situation, really.  Just another affidavit.

1   And if they, meaning the government, wants to argue that that's

2   somehow deficient, y'all can talk about how to get that before

3   me in the most efficient manner.

4        Anything else before we go off the record?

5             MR. PEKRON:  No, your Honor.

6             MR. MCFADDEN:  No, your Honor.

7             THE COURT:  All right.  Court is in recess.

8        (Proceedings adjourned at 2:34 p.m.)

9                      REPORTER'S CERTIFICATE

10       I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

11

12                                   Date:  July 18, 2019

    /s/ Christa R. Jacimore, RDR, CRR, CCR
13       United States Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25